# COMPOSITE EXHIBIT "A"

## Declaration of Robert D. Moody

I, Robert D. Moody submit this declaration and declare the following:

1. I am over 18 years of age and have personal knowledge of the information contained herein.

2. I was retained by the Plaintiff, by and through counsel on May 29, 2017.

3. The Plaintiff claims to be and has proven that they are visually impaired and claims to have rights covered under the Americans with Disability Act (ADA).

4. I was retained to examine evidence provided by the Plaintiff and gathered on my own evidence as it relates to the mobile website belonging to Leslie's Poolmart, Inc. .

5. The URL for this mobile website is: https://www.lesliespool.com/ .

6. The Plaintiff, in his interview has claimed that the mobile website fails to provide adequate accommodations for his impairment.

7. Specifically, the Plaintiff has claimed that the mobile website fails in the following areas:

    a. Mislabeled links
    b. Content was not presented in a way without losing information and structure
    c. Incorrect description of site images

8. My analysis of this issue shows following:

    a. The company, Leslie's Poolmart, Inc., is in the business of swimming pool product retail.
    b. The Company, Leslie's Poolmart, Inc., has a brick and mortar location or sells its products through an affiliate.

    c. The affidavit provided by Plaintiff has identified the mobile website in question as:

    https://www.lesliespool.com/

    d. The affidavit provided by Plaintiff has stated that he visited the mobile website in question.

e. A review of the screen capture provided by the Plaintiff shows that the mobile website does contain the defects and limitations as identified by the Plaintiff.

f. A review of the screen capture shows that the issues the Plaintiff identified in their affidavit, did exist and the issues do appear to be dramatically impairing the Plaintiff's ability to use the mobile website.

g. Prior to executing the Declaration, I performed an independent review of the mobile website located at:

https://www.lesliespool.com/

h. As part of my review, I used the enhancement features found on my mobile device as well as software available to the Plaintiff or individuals with a similar disability.

9. From my review, I have developed the following opinions:

a. It is my opinion that the mobile website in question does have the issues identified by the Plaintiff.

b. It is my opinion that the Plaintiff, given their disability, was not able to adequately and effectively use the mobile website.

c. It is my opinion that the issues appear to be with the mobile website's design and this oversight by the company and its developers have limited or prevented access by the Plaintiff.

d. It is my opinion that this limited access or prohibition is related to the Plaintiff's disability.

Under penalty of perjury, I hereby and affirm the following statements are true and correct

03 July 2017

Robert D. Moody, JD CISA CISM ACE



**Robert D. Moody, JD CISA CISM ACE**
Rmoody@fds.global

## Personal Statement

During my tenure as a professional, I have had the pleasure of working with many brilliant, capable colleagues that have helped or influenced millions of lives. As the work and time progressed, I have always tried to keep in mind: "life isn't complicated, it just seems that way" (author unknown).

By always dissecting complicated problems to their base elements, one can always determine both the source and solution to the issue. This is the secret to my success!

As a seasoned professional, I have watched the world change. I have seen technology become more entrenched in our daily lives and I have seen this technology misused so that the users can be exploited.

Professionals of all disciplines must now rise to the challenge and focus on more than self-interest. We are in a time where professionals must be renaissance men. These men and women must now engage in lifelong learning and have strong technical backgrounds. They must also seek out both the hard and soft sciences as well as humanities.

Technology has caused the flattening of the world. We are no longer able to remain in isolation. We are connected, always connected. Our technology has permanently provided a steam of information that links us all in ways that we have yet fathomed.

Because the world is flat, this technology and the resulting data has to be protected. This is the job of the Forensic / Data Security professional. We are the stewards of this technology must know not only how it works but also how it was used.

It is this 21st century paradox that I have dedicated my life to.

## Education

The process of educating oneself can take many forms. As technology has flattened our world over the last 20 years, I have accepted that professionals must not only seek traditional lifelong learning opportunities but they must also seek to engage other cultures, varying schools of thought and contrary views to ones own.

**Nova Southeastern University**, Broward County Florida, Bachelors of Science, 1990

**St. Thomas University School of Law**, Miami-Dade County Florida, Juris Doctorate, 1993

**Oxford University**, Oxford England, PGDip – Global Business, 2017







## Certifications

In the world of consultancy, technical competency is extremely important. The issue within a technology field is that there are many charlatans in the certification world. I pride myself on having focused on Internationally known, directly actionable certifications that actually insure that the individuals involved with the certification and carries their credentials are technically proficient.

I invest more than 20 hours of training per year for the certifications listed. In some cases, I will invest between 100 to 200 training hours per certification period.

**Certified as an Information Systems Auditor (CISA),** Information Systems Audit and Control Association, 2002

**Certified as an Information Security Manager (CISM),** Information Systems Audit and Control Association, 2003

**Certified in Computer Forensics,** Oregon State University, 2003

**Certified as an Access Data Certified Examiner (ACE),** Access Data Corporation, 2009, 2015

## Professional Service Experience

My professional life has been filled with variety and challenge. The information below provides a quick peek into the organizations I have been privileged to work with. The skills I have obtained at each stop has allowed me to be more successful and more competent in the ever changing and increasingly complicated world I have chosen to work in.

### Forensic Data Services, Inc. (FDS Global) (2008 – Present)

I am the Founder, President, CEO and senior analyst at Forensic Data Services, Inc. FDS is a boutique consulting firm that focuses on addressing complex forensic and security issues for their clients that transcend traditional click and review analysis approaches. FDS' specializes in working as an important part of the litigation or investigative team and adding value to the process by its ever-growing range of experience and skills to meet the needs of the client and completing the objectives of the team.

### Berenfeld Spritzer Schechter and Sheer (BSSS) (2006 – 2008)

I was a partner and practice leader. BSSS was a regional full service, full charge accounting firm with offices throughout the region. I was in charge of the Digital Forensics and Investigations group (DFI) where the group provided support for the forensic accountants and their cases as well as the audit teams.







Additionally maintained its own case load and for both years of its operation DFI was the second largest practice by sales volume and we were the smallest group by personnel making DFI a valued resource to the firm.

## Grant Thornton (GT) (2004 – 2006)

While I was at GT, I served as a director and practice leader assigned physically to the Miami market space but worked globally overseeing digital forensics. My mandate when hired was to build the digital forensics and capabilities of the firm both domestically and foreign.  This I did. During my tenure at GT, I assisted in building GT's capabilities into a globally recognized, technically proficient force delivering services throughout the US, Latin America, Europe and Asia.  At the annual internal forensics group meeting, projects were forced rank by revenue and complexity. In each year of participation, my group ran or supported 8 of the 10 top engagements in year 1 and 9 of the 10 top projects in year 2.

## Rachlin Cohen and Holtz (RCH) (2000 – 2004)

During my tenure at RCH I was tasked with the duties of the firm's Chief Information Officer and the complete rebuild of the firm's I.T. infrastructure. Additionally, I began a digital forensics consulting practice. The first such practice in Miami. In my role of CIO, my team and I successfully reengineered all technical services providing a very highly secure, streamlined operation that exists to this day. In my role as a consulting practice leader and director, I built a successful practice that was profitable every year of its operation and staffed with a team of 10 trained professionals at the time of my exit.

## Southern Wine and Spirit (SWS) (1999 – 2000)

My mission at SWS was straightforward, I was hired in February 1999 because a Y2K problem existed and this issue effected every aspect of the organization. I was hired to oversee the remediation of the primary warehouse and executive space of the organization that would in effect assist in remediating the Y2K challenges the company was facing and to do so without taking the firm and its thousands of employees and hundreds of offices off line and insure that the Y2K problem is resolved prior to December 31, 2000.  I successfully completed my tasks.

## Tew Cardenas (TW) (1997 – 1999)

I was hired as the IT director for a major regional law firm who was having operational, logistic issues. The firm needed a complete overhaul but without the disruption of its business units. I was hired to complete this task. The makeover effectively covered four offices in Florida and Washington DC, it involved to delivery of best of breed software, correcting networking, security and communication issues. Many of the systems and designs put in place in this time period remained until the closing of the firm due to the death of its founding partner Tew in 2014.

## TNS Professionals (TNS) (1985 – 1997)

TNS was a medical staffing company with interests in the home infusion, home dialysis, mental health,







home nursing, hospital department leasing and hospital employee leasing markets. TNS provided medical professionals numbered more than 700 and supported to governmental, private and public facilities. The professionals provided ranged from MDs to health aides. My tenure allowed me to serve in many different organizational roles that included accounting and finance, information technology, risk management, and in-house legal department. I served on accreditation committees, M&A committees, and governmental contracts committee. The company was sold in 1997.

## United States Army (USA) (1981 – 1987)

I was a member of the United States military form 1981 – 1987. This includes an extended period as part of the active army and the balance in the reserves. During my tenure in the USA, I served as a member of the Berlin Brigade and as a member of the 7th Calvary Division.  During this time I was often deployed to destinations designated by my superiors and was always successful in completing the missions set for my team and I.  Upon completion of my time in service I was Honorably discharged and awarded a good conduct medal.

## Investigative Service Experience

This section is to provide the reader with an understanding of the depth and breadth of cases I have worked in my professional career. The titles are designed to provide a key theme of the case where the descriptions are to provide a better but brief understanding of the facts that existed.

It is important to note that I cannot list all of the cases, technologies, legal issues, and craziness that this work often leads to. I suggest that if the reader has a set of facts or specific technology concern, they are welcome to contact me directly and we can discuss.

Lastly, within this section you will find the terms "I" , "FDS" , "We" or some variation thereof. It is important to note that where I served as the senior analyst and project manager and may refer to myself or as part of FDS or a team, I am always supported by an incredible group of individuals, a.k.a. "my team."

**Big Data Analytics (1)** – Client, a third tier controlled substance reseller, was accused of knowing purchasing controlled substance based medication from a known supplier who later proved to be part of the illegal distribution ring.  The accusation by the government was based on the idea that the Client knew that the discounts it was receiving was too favorable for the product in question and for the vendor and therefore they should have assumed the medication was stolen.

To address the Government's position I built a database with the client's historical records covering a time period of five years and then acquired data from a variety of industry recognized brokers as well as competitor resellers. The data was normalized and a single database was built that then allowed the legal team to run models and hypotheticals against the data to provide evidence to support what really happened.






**Big Data Analytics (2) –** A large publicly traded Health Care Insurance Company's CEO was accused of manipulating the Stock price through a series of techniques. The extent of the fraud totaled more than $500,000,000 (USD).

Working as part of the investigative team and supporting both the financial team hired by the Board of Directors as well as supporting the Federal Investigators, my team was responsible for the collection and analysis of all communications effectively establishing the quiet conspiracy that exists between several key members of the organization.

**Big Data Analytics (3) –** A large Northeastern tech firm was accused of stock manipulation by a series of balance sheet adjustments regarding the company's inventory and raw material. The Board of Directors hired a forensic team to conduct an analysis of this issue as well as to perform an investigation on all potentially related parties. My team assisted the forensic financial team in the extraction and analysis of financial data and conducted the Person of Interest investigation in an attempt to identify each individual's knowledge and the POI's involvement in the conspiracy.

**Big Data Analytics (4) –** Client presents a "made for movie" tale of stalking, harassment, and computer hacking as well as identity theft. Client claims to be harassed and stalked for more than two years. During this time credit cards are compromised, technology has been breached, bank accounts emptied.

Stalker eventually increases the threat level through physical break-ins, death threats, more and constant on-line attacks through social media. I was hired to address the veil of technology that the stalker was hiding behind and to help determine how to stop the almost constant attacks.

The primary issue in this case was the overwhelming amount of data and the tens of thousands of data points that needed to be analyzed on both the individual incident level as well as examining the data points for relationship value in the overall attack analysis.

All of the data was reviewed and normalized and then placed into a single relational database that was used to determine patterns of behavior and worked to tie back to specific conduct to a known person.

**Embezzlement (1) –** One of the first embezzlement schemes I investigated involved the bookkeeper of a company who used a manual check system and wrote too many checks. They were able to conceal their criminal activity by not being very good at their job so certain records were either always misplaced or lost over time. This primary issues were: (1) the lack of duty separation, (2) no accountability, (3) no job descriptions or systems in place. Over a five-year period, the bookkeeper stole $175,000.00 USD.

**Embezzlement (2) –** A variation on the embezzlement scheme involved the accounting manager being solely responsible for invoice generation, credit card processing and applying payments. The accounting manager's scheme involved creating a similarly named company and would process customer payments in a way that her employer would get the large payments but the company practice of writing off 10% – 20% would be negotiated hard and this "write-off would be seen on the A/R but in actuality the amount







would be charged to the customer's credit card and the funds deposited in the accounting manager's new company. The accounting manager stole $1,600,000.00 over three years.

**Embezzlement (3)** – Accounting scheme employed by a small firm bookkeeper that was paid based upon the collections of the practice. Bookkeeper performed all of the services of a full charge / full time bookkeeper but instead of receiving a traditional salary, they was compensated 5% of the net collected amount. This net amount is calculated after expenses and discounts. After about six months, the business owners noticed a difference between what they thought would be in the bank and what was actually was in the bank. Analysis of the data showed that the bookkeeper was taking 5% of the gross at time of billing. This not only violated the agreement in place but created a serious cash flow burden on the business.

**Employee Gone Bad (1)** – Local professional arrives at work one morning only to discover all of his files were encrypted and a letter from his assistant tendering her resignation and demanding 2 years severance. In return for the severance, she could get the files unlocked. - Assistant had used one of the office's computers to encrypt the files and she had left the computer on. FDS performed an analysis of the RAM and was able to recover the password and unlock the files. The employee was prosecuted.

**Employee Gone Bad (2)** – Local professional with a large practice and his own IT team became concerned with his IT operations and IT security and the amount of time it took to keep his operations protected. The practice's IT director used every weekend from Friday at 3pm to Monday at 10am to update and maintain the computer systems. The business owners and the other professionals knew not to come to work during those hours and followed these instructions for over two years.

What was really going on is that the IT director was running a weekend gaming tournament and was using the businesses systems and space to accomplish the "for profit" venture. FDS determined the following: The operation was full every weekend and would let 37 players battle head to head for $100 for the entire weekend. Once a month there was a tournament where the cost went up to $250 and the winner would be awarded a cash prize of $1000 plus a trophy. You had to play all month to be invited to the tournament. Every quarter the top players would be invited back and at the end of the year. It is estimated that the IT director generated more than $200,000 USD before he was caught.

**Employee Gone Bad (3)** – There is a phenomenon in the organizations around the world. For some reason, employees who are paid to do a job feel that the output they have been paid to do belongs to them. This is a fallacy. Unless there is an agreement stating this, work performed by an employee and paid for by the employer belongs to the employer. FDS is presented with many variations of this scenario throughout the year. It seems that the employee is unhappy or feels that they are not properly compensated and plans to leave or extract revenge for some wrongdoing. It is in these situations that the employer's information, intellectual property is targeted.

In many cases, the employee will quit, having already taken copies of what they deemed to be valuable. Equally as likely, the employee will be fired but the employer will allow them access to the company technology after termination and it is during this time that the theft occurs.







No matter the scenario, FDS has successfully investigated the theft of the IP and the process used to steal the theft helping the employer to prevent the behavior in the future.

**Viatical Ponzi Scheme (1) –** This type of Ponzi scheme is the fraudulent reselling of the beneficiary rights of a life insurance policy to an investor. The owner of the policy sells the beneficiary rights to a broker who sets the policy value based upon life expectancy and then resells the beneficiary rights to an investor who pays a portion of the face based upon the health issues and the expected length of life of the insured.

This particular scheme focused on the selling of the scheme as an insurance product and to engage local agents to identify potential victims. The scheme paid huge commissions 5 to 8 times normal for a similar legitimate product to the agent, who through their involvement provided the legitimate face to the criminal activity.

The targets were primarily the elderly, as single investors. This allowed the criminals to avoid the scrutiny and due diligence of institutional investors and the Securities Exchange Commission. The criminals were successful in securing approximately $200,000,000 (USD) from the Elderly.

**Viatical Ponzi Scheme (2) –** The nature of the Ponzi scheme is similar to the last but with one slight difference. Instead of being a product sold through the "insurance" industry, it was sold as an "investment" product.

The approach was the same and the amount of monies stolen was over $1,000,000,000 (USD). A crime of this magnitude involved more than a petabyte of data and involved collection and processing of information on a scale not seen at that time.

**Financial Institution (1) –** Corporate office of a South Florida branch was breached through a phishing attack. Attacker was successful in converting less than 2% of its targets but yet was successful in securing control over sensitive data and effectively stealing approximately $100,000.00 by re-directing wired funds. FDS' investigation helped quickly identifies the specific email, the malware that was delivered and all infected machines. Further work allowed for the full removal of the malware as well as the tracking of the malware back to its origin, which was used by the Government to effect an arrest and recover the funds.

**Financial Institution (2) –** International bank that discovered, from a unrelated investigation, it had been breached asked for analysis on the Bank's security position. FDS' investigation determined that information was leaking through a variety of methods and that its monitoring and contingencies were not sufficient in protecting the client. Most importantly, FDS determined that the weakest link were the client's employees and that future breaches or data leaks would come primarily from this source.

**Global Industrial Espionage (1) –** International businessman with operations globally felt that his private communications were being intercepted. The concern was that the usual suspects were not in his native country of Argentina, technology had to be used. FDS' investigation pursued and uncovered







technology deployed in both the clients' offices and home that allowed the spy to monitor every aspect of the client's life right down to what was happening in the client's bedroom.

**Global Industrial Espionage (2) –** A not for profit that provided an internationally recognized certification for its industry found itself with a two-prong problem. The CEO and the CIO were both terminated for cause. The CEO's termination for cause resulted in a lengthy negotiation for removal and it was felt by the board (members were global) that the CEO was too informed on the private conversations. FDS' investigation uncovered that a sophisticated network of monitoring equipment had been deployed throughout the organization that allowed the CEO and CIO direct access to any room (including bathrooms) in any of the client's facilities. Once discovered, the negotiations turned in favor of the not for profit. The CIO was terminated for cause. In the CIO's negotiations, the CIO received final payment and the databases maintained by the client began an automatic purge of its data. Quick thinking on the part of an employee saved the company from a total loss. FDS began another investigation and determined that the CIO had orchestrated the attack. No criminal charges were brought and the CIO made the company whole.

**Data Breach (1) –** I was hired as an independent Investigator for a SA financial institution to investigate a data breach of personal files belonging to key members of the client organization and their immediate families. My work was quickly modified to include the Executive Branch of the host government to further its own investigation. As the work developed, the hacker's identity was determined and it appears to be well known within the host country. Further evidence helped identify how the hacker was successful in attacking the family members, what information he took, what he used and what he sold and to whom. A successful arrest was made following the investigation.

**Data Breach (2) –** Medical Facility with more than 18 branches found that it had been the victim of a cyber-attack focused mainly on their cloud based services. Initially the attack appeared to be completely random but as FDS investigated new evidence developed and provided a more sinister picture. The breach appeared to be a concerted effort of employees "gone bad" and competitors. The company now faced with a series of internal, external, legal and regulatory issues, FDS assisted in securing the company, building the case used by the legal team and assisted in addressing ancillary legal issues as well as the mandated reporting requirements.

**Evidence Destruction (2) –** Client, a US company with an international reach and international executives terminated their CEO for cause. The CEO, on the way out the door took confidential files to negotiate a position with a competitor. The theft was discovered. FDS' investigation determined that

**Evidence Destruction (3) –** Client, a national construction company, is going through a business partnership divorce. As part of the process it was agreed that business data is shared but private communications are not. Client (individual) uses corporate email account to communicate with counsel and feels that this information is being monitored, as his ex-partner seems too informed. FDS' investigation determines that the office manager was spying on the client from both her terminal in the office and from home. FDS further determined that the business partner and the office manager then passed on the information collection to an anonymous Gmail account that only they accessed.







**IMF (1) –** I was retained by the Government to examine a DVR that had been used to record security footage at a private residence. The DVR was extremely high-end and was believed to have footage of a serious crime on its hard drive. The DVR employed a hardware based encryption routine that made it impossible to extract any data unless you followed the manufacturers instructions.

The governmental investigators mishandled the evidence and damaged the DVR. No data was found to be recoverable.

I was hired as a last resort. The device had been examined by several different agencies over an 18 month time period. All answers were the same. No Data.

My approach was to no repeat the same steps that was followed by all those who came before me and attempted a bit by bit mapping of the drives in an attempt to determine what was drive formatting, what was software and what was data.

I acquired a DVR that was an exact match (down to firmware and software versions) and formatted / prepped two new drives. I then analyzed the new (pristine drives) to determine data locations and plotted those locations. I then analyzed the evidence drives and found that the data locations matched.

I then surmised that all other data blocks on the evidence drive that were only on the evidence drive would have to be data associated with what the device recorded. I mapped this information and then painstakingly copied the data blocks from the evidence drive to the new drives.

When finished, I followed the manufacturers instructions and I was able to extract the video recordings and provide them to the government to further their prosecution.

**IMF (2) –** I was hired by a family who was being harassed and stalked by an unknown person, even though there were clear indications as to who was doing this.  The stalker would use technology to mask their conduct and their identity always slightly hidden behind the technology veil.

One of the technologies employed, was a voice masking software. The software would allow the user to disguise their voice by changing pitch, frequency and gender. This was a favorite tool of the stalker.

Eventually, I was able to obtain native recordings of the stalker. Even though the masking technology was employed, I was able to reverse engineer the settings to remove the modifications to pitch, frequency and gender, effectively producing the native voice of the stalker.

**IMF (3) -** I was hired by a physician who was accused of Medicare fraud. Proof of his innocence was stored on the backup tapes he maintained. Unfortunately, the tapes were of a low quality VHS type and the VHS recording method for data was never accepted as a best or reasonable practice and his system, which had just recently failed, was one of a kind. In other words he had proof of his innocence but there was no way to get to the data and prove it.



Certified Information Systems Auditor® (CISA)
ISACA



Certified Information Security Manager® (CISM)
ISACA



I was the third expert hired by the client. I began reviewing what the previous two had done as not to repeat the same mistakes. Once I knew how not to proceed, my research allowed me to determine a new course of action and the data was successfully recovered and used by the physician to resolve the matter favorably.

## Expert Witness Experience

The measure of any good expert is his ability to present his work in a court of law. He/She must be clear, concise and easily understood. Below you will find a list and description of my testimony over the last few years.

Latasha West v. Moral Foods, LLC., In the Circuit Court of the 17th Judicial Circuit, In and For Broward County, Florida, Case No.: CACE-14-017346 (09), Testified as to the process and analysis associated with surveillance video footage provided by the Defendant. **(Deposition)**

Coastal Construction Company of Palm Beach, Inc., d/b/a Coastal Construction of Palm Beach v. Roll Plumbing Company, Inc., In the Circuit Court for the 11th Judicial Circuit, In and for Miami-Dade County, Florida, Case No.: 08-56455-CA-23, Testified at Evidentiary Hearing regarding the destruction of data and likelihood of valuable evidence existing if hard drive had not been tampered with. **(Evidentiary Hearing)**

Jason Lee and Fine Marketing Solutions, LLC v. Kenneth A. Orr, Evan H. Berger, Triumph Small Cap Fund, Inc., J.D. Lauren, Inc., Solar Grid Capitol, Inc. and Ecologix Resource Group, Inc., In the Circuit Court for the 11th Judicial Circuit, In and For Miami-Dade County, Florida, Case No.: 2012-031582-CA-01, Testified at Evidentiary Hearing regarding process for examining evidence. **(Evidentiary Hearing)**

C.T. and L.T. Individually and as the Parents and Guardians of B.T., a Minor v. Alan Schiff, Merri Stander Schiff, and S.S., a Minor, In the United States District Court Southern District of Florida, Case No.: 14-61283-CIV-Scola/Otazo-Reyes, Testified at Evidentiary Hearing on Rule to Show Cause regarding the process to examine evidence. **(Evidentiary Hearing)**

C.T. and L.T. Individually and as the Parents and Guardians of B.T., a Minor v. Alan Schiff, Merri Stander Schiff, and S.S., a Minor, In the United States District Court Southern District of Florida, Case No.: 14-61283-CIV-Scola/Otazo-Reyes, Testified at Evidentiary Hearing on Order to Show Cause regarding the process to examine evidence. **(Evidentiary Hearing)**

Caribevision Holdings, Inc., et al. v. Omar Romay, et al., In the Circuit Court of the 11th Judicial Circuit In and For Miami-Dade County, Florida, Case No.: 11-25608 CA 02, Testified at Evidentiary Hearing regarding process for examining evidence. **(Evidentiary Hearing)**

The Florida Bar v. Jeremy W. Alters, In the Supreme Court of Florida (Before a Referee) Supreme Court Case No.: SC14-100, Testified at Trial regarding cellphone data being deleted and process for examining evidence. **(Trial)**






<u>Jason Lee and Fine Marketing Solutions, LLC v. Kenneth A. Orr, et al.,</u> In the Circuit Court of the 11th
Judicial Circuit In and For Miami-Dade County, Florida, Case No.: 2012-031582-CA-01, Attended Status
Conference on e-Discovery issues. **(Status Conference)**

<u>Caribevision Holdings, Inc., et al. v. Omar Romay, et al.,</u> In the Circuit Court of the 11th Judicial Circuit In
and For Miami-Dade County, Florida, Case No.: 11-25608 CA 02, Testified at Evidentiary Hearing
regarding the standards used in an investigation and the completeness of evidence. **(Evidentiary
Hearing)**

<u>In Re Application of Alianza Fiduciaria S.A. and Aquisgran Internacional S.A.,</u> In the United States District
Court Southern District of Florida, Case No.: 13-81002-MC-MARRA/MATTHEWMAN, Testified at Evidentiary
Hearing regarding recovery methods and what forensics can do. **(Evidentiary Hearing)**

<u>Nicola Thompson Ho-Sang v. Florida Peninsula Insurance Company,</u> In the Circuit Court of the 17th
Judicial Circuit In and For Broward County, Florida, Case No.: 13-07755 21, Testified at deposition
regarding metadata identified in photographs. **(Deposition)**

<u>The Florida Bar v. Jeremy W. Alters,</u> In the Supreme Court of Florida (Before a Referee) Supreme Court
Case No.: SC14-100, Testified at deposition regarding Cell Phone Data and the forensic testing of that
data. **(Deposition)**

<u>State of Florida v. Clifton Afflick-Laidley,</u> In the County/Circuit Court of the 17th Judicial Circuit In and For
Broward County, Florida, Case No.: 13-10864CF10A, Testified at Retrial regarding Cellular Phone Tracking
using CDR and Drive Testing as a valid/invalid means of identifying the location of the device. **(Retrial)**
<u>State of Florida v. Andres Rodriguez Torres,</u> In the Circuit Court of the 6th Judicial Circuit In and For
Pinellas County, Florida, Case No.: 522013CF018879XXXXNO, Testified at Trial regarding the reliability of
video footage and issues with missing and/or possibly altered footage. **(Trial)**

<u>State of Florida v. Andres Rodriguez Torres,</u> In the Circuit Court of the 6th Judicial Circuit In and For
Pinellas County, Florida, Case No.: 522013CF018879XXXXNO, Testified at deposition regarding the
reliability of video footage and issues with missing and/or possibly altered footage. **(Deposition)**

<u>State of Florida v. Clifton Afflick-Laidley,</u> In the County/Circuit Court of the 17th Judicial Circuit In and For
Broward County, Florida, Case No.: 13-10864CF10A, Testified at Trial regarding Cellular Phone Tracking
using CDR and Drive Testing as a valid/invalid means of identifying the location of the device. **(Trial)**

<u>Rich Dad Education, Inc. v Deanna Heminger and Fortunebuilders, Inc.,</u> In the Circuit Court of the 20th
Judicial Circuit of Florida In and For Lee County, Florida, Case No.: 15-CA-000350, Testified at Evidentiary
Hearing regarding analysis of E-Mail account and Record Sharing. **(Evidentiary Hearing)**

<u>State of Florida v. Clifton Afflick-Laidley,</u> In the County/Circuit Court of the 17th Judicial Circuit In and For
Broward County, Florida, Case No.: 13-10864CF10A, Testified at deposition regarding Cellular Phone
Tracking using CDR and Drive Testing as a valid/invalid means of identifying the location of the device.
**(Deposition)**

 



The Florida Bar v. Jeremy W. Alters, In the Supreme Court of Florida (Before a Referee) Supreme Court Case No.: SC14-100, Testified at Evidentiary Hearing regarding Cell Phone Data. **(Evidentiary Hearing)**

Belinda Kelly v. Anthony Johnson, In the Circuit Court of the 15th Judicial Circuit In and For Palm Beach County, Florida, Case No.: 502015DR000124XXXXSB, Testified at Evidentiary Hearing regarding process involved to conduct Forensic Investigation. **(Evidentiary Hearing)**

The Florida Bar v. Jeremy W. Alters, In the Supreme Court of Florida (Before a Referee) Supreme Court Case No.: SC14-100, Testified at deposition regarding E-Mail and Cellular Phone data. **(Deposition)**

State of Florida v. Sergio Barrantes, In the Circuit Court of the 17th Judicial Circuit In and For Broward County, Florida, Case No.: 11-12770CF10A, Testified at Evidentiary Hearing regarding Peer-to-Peer Software and Computer Forensics of P2P networks. **(Evidentiary Hearing)**

The Florida Bar v. Jeremy W. Alters, In the Supreme Court of Florida (Before a Referee) Supreme Court Case No.: SC14-100, Testified at Evidentiary Hearing regarding Computer Forensics, E-Mail, Text Messages, metadata, and file system analysis. **(Evidentiary Hearing)**

State of Florida v. Arnold Maurice Mathis, In the 10th Judicial Circuit In and For Polk County, Florida, Case No.: 2012CF-000927-XX, 2012CF-001037-XX, 2012CF-002332-XX, 2012CF-002333-XX, 2012CF-002334-XX, Testified at deposition regarding Computer Forensics, Cellular Phone analysis, and Data Security. **(Deposition)**

Ocean Bank v. Adrian Development at Pebble Walk Partnership, LLLP, In the 11th Judicial Circuit In and For Miami-Dade County, Florida, Case No.: 08-59415 CA 21 Consolidated with Case No.: 10-63789 CA 21, Testified at deposition regarding as to the specifics of a prior investigation I performed. **(Deposition)**

John Patten v. GEICO, In the Circuit Court of the 9th Judicial Court in and for Orange County, Florida, Case No.: 2012-CA-014535-O, Testified at Trial regarding the receipt of an E-Fax and the use of the document contained within. **(Trial)**

Jason Fine v. Kenneth Orr, In the Circuit Court of the 11th Judicial Circuit In and for Miami-Dade County, State of Florida, Case No.: 12-31582 CA 40, Testified at Evidentiary Hearing regarding appointment of Computer Expert and/or Other Further Discovery Relief. **(Evidentiary Hearing)**

Emerald Village, L.L.C. v. Pacific National Bank, N.A., In the Circuit Court of the 11th Judicial Circuit In and for Miami-Dade County, State of Florida, Case No.: 09-24685 CA 23, Testified at Evidentiary Hearing regarding evidence preservation and spoliation issues. **(Evidentiary Hearing)**

State of Florida v. Henri Bart LaRue, In the Circuit Court of the 5th Judicial Circuit In and for Lake County, State of Florida, Case No.: 2013-CF-000187-A-02, Testified at Trial regarding the time stamps on







numerous digital recordings and the adjustment of faulty timestamps as it relates to the overall analysis and timing of events. **(Trial)**

John Patten v. GEICO, In the Circuit Court of the 9th Judicial Court in and for Orange County, Florida, Case No.: 2012-CA-014535-O, Testified at deposition regarding the existence and ready of e-mails from the carrier to the insured. **(Deposition)**

United States of America v. Sean David Pickett, In the United States District Court Southern District of Florida Fort Lauderdale Division, Case No.: 13-CR-20599-WPD, Testified at Trial regarding the collection of evidence, analysis of said evidence and issues surrounding virtual memory analysis, computer operation and use of Peer to Peer software. **(Trial)**

US Medical Care, Inc., Sasson Moulavi, M.D., and Renata Moulavi v. Kenneth N. Woliner, M.D., Holistic Family Medicine, LLC, and Gina Ricciardi, In the Circuit Court for the 15th Judicial Circuit in and for Palm Beach County, Florida, Case No.: 50-2010-CA-029473-XXXX-MB AA, Testified at deposition regarding website traffic and related metrics. **(Deposition)**

Jennifer Martinick, MBBS, Melike Kulahci, M.D., Lawrence J. Shapiro, D.O. v. Media Visions, Inc., In the United States District Court Southern District of Florida, Case No.: 0:13-cv-61148 WPD, Testified at Evidentiary Hearing regarding evidence preservation and spoliation issues. **(Evidentiary Hearing)**

Department of Health, Board of Medicine v. Peter Choy, M.D., State of Florida Division of Administrative Hearings, Case No.: 13-004280PL, Testified at deposition regarding information mined from an Electronic Medical Records System and variations associated with the data extracted. **(Deposition)**

Winston Towers 300 Condominium Association, Inc. v. QBE Insurance Company, In the 11th Judicial Circuit In and For Miami-Dade County, Florida, Case No.: 10-45030 CA 05, Testified at deposition regarding documents which were produced from an Agent of the Plaintiff and whether or not the documents were produced in an authentic and unaltered state. **(Deposition)**

State of Florida v. Joseph D. Baldino, In the Circuit Court of the 19th Judicial Circuit In and for Saint Lucie County, State of Florida, Case No.: 562011CF001300A, Testified at Evidentiary Hearing on issues surrounding IP address matching to physical location. **(Evidentiary Hearing)**

State of Florida v. Plenord St. Fort, In the Circuit Court of the 17th Judicial Circuit In and For Broward County, Florida, Case No.: 10-18683 CF10A, Testified at deposition regarding information discovered regarding on line application for position on Monster.com and Email communications between Defendant and other parties of interest. **(Deposition)**

John H. Jervis, et al. v. Jose Castaneda, et al., In the Circuit Court of the 15th Judicial Circuit In and For Palm Beach County, Florida, Case No.: 502011CA006657XXXXMBAE, Testified at deposition three separate







times on issues surrounding Electronic Signature Authentication and other items identified as part of my expert opinion. **(Deposition x3)**

State of Florida v. Alexander Whitaker, In the Circuit Court of the 17th Judicial Circuit In and For Broward County, Florida, Case No.: 12003410CF10A, Testified at deposition as to findings regarding criminal charges and data found on media reportedly belonging to the Defendant. **(Deposition)**

United States of America v. Alexander Michael Roy, United States District Court Southern District of Florida, Case No.: 12-14022-CR-Moore/Lynch, Testified as to findings regarding the contents of the media reportedly belonging to the Defendant. **(Trial)**

Anne Abraham et al v. MHM Solutions, Inc. et al., In the Circuit Court of the 17th Judicial Circuit in and For Broward County Florida, Case No.: 09-46153 (05), Testified at Evidentiary Hearing regarding the protocol required to correctly collect, process, and produce Electronically Stored Information. **(Evidentiary Hearing)**

United States of America v. Spencer Scott Kellam, United States District Court Southern District of Florida, Miami Division, Case No.: 11-60206-cr-Hurley/Vitunac, Testified at Evidentiary Hearing regarding findings by US Bureau of Prisons background investigation of the Defendant. **(Evidentiary Hearing)**

State of Florida v. Samuel Martin, In the County Court for the 6th Judicial Circuit In and For Pasco County, Florida, Case No.: CTC1103816MMAWS-17, Testified at Evidentiary Hearing regarding the metadata associated with pictures and an SD card reportedly belonging to Defendant. **(Evidentiary Hearing)**

State of Florida v. Bruce Alperstein, In the Circuit Court In and For Santa Rosa County, Florida, Criminal Division B, Testified at Evidentiary Hearing regarding issues with the authenticity and validation of the electronic evidence collected, processed and copied by the Government. **(Evidentiary Hearing)**

Zip Wireless Products, Inc., Z-Think, LLC v. Brian Moroney, et al., In the Circuit Court of the 9th Judicial Circuit In and For Orange County, Florida, Circuit Civil Division, Case No. 10-CA-17309-32, Testified at deposition regarding computer artifacts identified as being related to potential hacking of company IT infrastructure. **(Deposition)**

Mary Laurine Umstead v. Horizon Bay Mgt., LLC, et al., In the Circuit Court of the 13th Judicial Circuit of the State of Florida In and For Hillsborough County, Circuit Civil, Testified at Trial as to whether or not the information contained in an Electronic Medical Record system was accurate and whether or not certain operational practices were followed. **(Trial)**

In re: Rothstein Rosenfeldt Adler, P.A., US Bankruptcy Court for the Southern District of Florida, Case No.: 09-34791-BKC-RBR, Testified at Evidentiary Hearing to qualifications and to be appointed as the Court's expert. Accepted as an Expert and appointed to address complex technical issues facing the Court and issued a report on the same. **(Evidentiary Hearing)**

United States of America v. Michael Meister, United States District Court Middle District of Florida, Case






No. 8:10-CR-339-T-26AEP, Testified at Evidentiary Hearing regarding the complex issues involved in the collection, preservation, review, and analysis associated with the Governments case. **(Evidentiary Hearing)**

United States of America v. William Vazquez Rivera, In the United States District Court for the District of Puerto Rico, Criminal Number 09-361 (JAF), Testified at Trial regarding issues with identifying the specific location of a computer as well as identifying the individual who was at the computer at a specific date and time. **(Trial)**

Mathew Beck, et al. v. Boce Group, LLC d/b/a Next Café, et al., US District Court for the Southern District of Florida, Case No.: 04-20683-CIV-Cooke, Testified regarding the destruction of computer data, the existence of an audit trail and the possible manipulation of time keeping records. **(Deposition and Trial)**

Health Trio v. Ralph Korpman, et al., In the Chancery Court for Davidson County, Tennessee, 20th Judicial District, Civil Action No., 05-559-III, Testified on the potential destruction of evidence, possible violation of a court order preserving all information on the computer, and the possible destruction of evidence through the use of file scrubbing software. **(Deposition and Trial)**

William P. Planes, Sr. v. Rocky Shirey, et al., In the Circuit Court for the 6th Judicial Circuit in and for Pinellas County, Florida, Case No.: 06-9077-CI-19, Testified at Evidentiary Hearing regarding issues involving the identification and preservation of data belonging to the Defendants. **(Evidentiary Hearing)**

Jan Bronstein v. Marc Bronstein, United States District Court, Southern District of Florida, Case No.: 06-80656, Testified at deposition regarding the ownership and go-live date of a company's website and its domain. **(Deposition)**

In Re: The Marriage of Stuart Pressman and Wendy Bulgrin, In the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, Case No.: 06-008172, Testified on topics that included the collection, preservation, processing of data stored within a Point of Sale System used by the couple's business and inventory issues. **(Evidentiary Hearing, Deposition, and Trial)**

Building Education Corporation v. Jose Manuel Fernandez, et al., In the Circuit Court of the 11th Judicial Circuit in and for Miami Dade County, Florida, Case No.: 03-15909 CA 09, Testified at Evidentiary Hearing providing information to the Court for possible selection as a neutral expert in the investigation and tracking ESI through a large IT infrastructure. **(Evidentiary Hearing)**

Microsoft Corporation v. Big Boy Distribution, LLC, In the United States District Court in and for the Southern District of Florida, Case No.: 07-80296-CIV-Hurley/Vitunac, Testified at deposition regarding the examination of Plaintiff's expert's report and the methods used by said expert in coming to their conclusions. **(Deposition)**

Orlando/Orange County Expressway Authority v. Tuscan Ridge, et al., In the Circuit Court of the 9th







Judicial Circuit in and for Orange County, Florida, Case No.: 2006-CA-006250-0, Testified at Evidentiary Hearing regarding establishing the true and correct Metadata information associated with computer files created by an expert in an Eminent Domain action. **(Evidentiary Hearing)**

Med Data Infotech USA, Inc. v. Unnikrishnan Thankappan, et al., In the Circuit Court of the 6th Judicial Circuit in and for Pasco County, Florida. Case No.: 51-2004-CA-00321WS, Testified at deposition regarding the contents of several hard drives containing information relating to computer software created by the Plaintiff. **(Deposition)**

E&F Contractors, Inc. v. Turner Construction Company, et al., In the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida, Complex Business Litigation Section, Case No.: 02-32516-CA-40, Testified at Evidentiary Hearing regarding addressing the collection, preservation, processing, analysis, and possible destruction of evidence. **(Evidentiary Hearing)**

Benjamin J. Philips, III v. Oracal USA, Inc., In the Circuit Court of the 4th Judicial Circuit, in and for Duval County, Florida, Case No.: 16-2007-CA-006905-XXXX-MA, Division CV-E, Testified at Evidentiary Hearing regarding issues surrounding the destruction of evidence from a company owned laptop used by the Plaintiff. **(Evidentiary Hearing)**

Jessica Lane v. Adam Gerry, In the Circuit Court for the 20th Judicial Circuit in and for Collier County, Florida, Civil Action No. 08-9521-CA, Testified at deposition regarding issues surrounding the disappearance of a laptop and the information found on the device after it had been recovered. **(Deposition)**

## Teaching and Lectures by Topic

Teaching others about the complex and often convoluted world of digital forensics and information security is the only way one can be sure that the correct information is being shared. I have always dedicated my self to sharing my passion with those who want or need to know.  This section shares only a small part of my efforts over the last few years.

- Adjunct Professor – IE Business School, Madrid Spain, Masters in Cyber Security, My area of responsibility is in Digital Forensics and Computer Crimes.

- Computer Forensic Issues important to the Criminal Defense Bar. Private event sponsored by FDS. May 2016, Event provided instruction on six different forensic challenges facing criminal defense attorneys in practice.

- Mobile Devices and BYOD/CYOD: the eDiscovery Challenges, Panelist, LawTech Europe Congress 2015 Conference, October 2015.






- The Lifecycle of Electronic Evidence - Have we Finally Got it Right?, Panelist, LawTech Europe Congress 2015 Conference, October 2015.

- Cellular Phone Tracking Via Cell Towers – Dispelling the Post Mortem Analysis Myth, 7th European Academy of Forensic Science Conference, September 2015.

- Digital Security and the Dangers Facing Every Employer, 7th European Academy of Forensic Science Conference, September 2015.

- Cellular Phone Tracking Via Cell Towers – Dispelling the Post Mortem Analysis Myth, High Technology Crime Investigation Association, August 2015.

- 48 Hours of a Cyber Security Breach – What To Do From a Technical Standpoint: A First Responder Case Study, The Daily Business Review's Corporate Counsel Summit, May 2015.

- Data Security: What is a RAT? (Remote Access Trojan), Daily Business Review's Corporate Counsel Summit, November 2014.

- Data Security, Keeping Your Database, Customer Information and Other Proprietary Information Safe and What To Do If There Is A Security Breach, Daily Business Review's Corporate Counsel Summit, April 2013.

- Data Security, LawTech Miami, November 2013.

## Publications

In my role as an expert, I am required to keep a list of all publications I produce. I believe the importance of informing the interested public on the latest issues in my industry and the written word is an excellent way to accomplish this task. Here is the most recent list of publications.

- Globalization and Data Protection – An Analysis of Practicality, PGDIP – Global Business, Oxford University, February 2017.

- Electronic Discovery – 21st Century Road map, Georgia Defense Lawyers Association Periodical, May 2006.

- Firms Face Forensic Challenge, South Florida Business Journal, May 2006.

- Electronic Discovery: A Smart Five-Step Approach, South Florida Legal Guide, November 2006, Reprinted 2007.

- What Every Business Needs to Know about Evidence Preservation and Electronic Discovery Issues,






September 2007.

- Forensic Times Newsletter, 2007 & 2008. (Trade Publication produced by firm)

- Discovery Requests: Knowing when and how to proceed can save thousands and the case, Smart Business, May 2008.

## (KTWP) White Papers

Recently, I was asked to review and comment on a series of industry related white papers. I found them to be written commercials with little value to the reader. In response to this offense to my visual senses, I have started developing "KTWP." This acronym stands for Knowledge Transfer White Papers. This format is designed to educate and provide material so that the reader has an actionable document to move forward with their work.

- How to obtain information from an Internet Service Provider, 2016.
- Electronic Discovery – Comparing the Current Choices in Review Platforms, 2016.

## Innovations

The need for constant innovation is a must. Technology and its inevitable exploitation continue to grow at an alarming rate. We must pursue new and creative ways to perform our tradecraft. To this end, I (We) (FDS) continue to develop new technologies and redesign workflows so that the processes and technologies designed to help collect, preserve, analyze, present, protect and share information remains equal to or surpasses conventional equivalents.

- **Dataferret** – Designed and built in the US. The Dataferret is a self contained, mobile collection device that is intended to allow anyone, no matter their technical ability to collect (forensically image) the contents of a computer hard drive. In its five years of constant developments it currently sits at version 5.0 that allows for multiple collections from a single hard drive, targeted collection of specific files, search capabilities, and whole drive encryption to protect the collected contents.

- **Pandora** – Designed as an answer to the global investigative challenge of *how does one examine data storage devices for stolen information without reviewing the physical contents of the devices?*

  The answer is Pandora!






Pandora is a hybrid of products and processes that permit the examination of any data storage device and determine if, either the exact content, partial content or derivative content exists. Pandora provides a platform to identify and drill down to specific files either by hash value, search terms, date filters as well as others. Pandora's processes permit the selection of the most relevant, exacting content while avoiding the owner's arguments of privilege, relevancy, cost, time, and disruption.

- **Kinetic Information Survey System (K.I.S.S)** – KISS is a long overdue response to the Electronic Discovery Review Platforms currently in use. KISS was designed and is now being used as a no cost solution to the high priced hosted platform solutions currently used everywhere.

  KISS was developed with the help of legal professionals and obtaining an understanding of what is really important in the discovery / data review process and what is identified as feature rich add-ons that add little value but increases the cost.

  KISS is designed to be an effective review platform that requires little to no training, it provides scalability, security and is immediately actionable by the reviewer.

- **FDS - Secure Phone** – Designed to meet the needs of private clients with personal, business and political interests in need of protection. The devices are built on a smartphone platform and can support telephone numbers throughout the world. The technology employs the latest available encryption techniques and leverages available technologies providing a near seamless use and high valued customer experience.

  What makes FDS Secure Phone different is that it is not just a phone; it is a custom designed solution to meet the unique habits of its user(s). FDS performs an analysis of how the technology will be used and then works to meet those needs... The security solution is designed around the user. This approach gives the user the best chance to remain secure and to continue to use and have confidence in ones own security.

- **FDS – NSA Databases** – The NSA database stands for **"Never Stop Analyzing."** In the digital world we find ourselves in, our devices monitor everything we do. They track our movements, our search preferences, our likes / dislikes and millions of other data-points that we have no idea the information is being gathered and stored.  Our NSA database approach allows us to work with clients to gather this plethora of data points and relate them. This holistic approach to data analysis often brings together evidence to tell what really happened and often removes anonymity and ambiguity from the investigation.







## Affiliations

In the unregulated market space as "litigation support," I have always been cautious about whom I have associated myself with and how I wanted my name and reputation perceived. I am proud to be associated with the following organizations and what they stand for.

- High Tech Criminal Investigation Association (HTCIA) – This is an organization of professionals, from both the public and private sectors dedicated to the securing, investigating and stopping technology based crimes.

- Information Systems Audit and Control Association (ISACA) – This is an organization of professionals dedicated to understand, test, audit, control and verify that information is what it is reported to be and to keep that information safe and resilient.

- Oxford University – This globally recognized university is an incredible resource. My relationships have assisted my clients in understanding technology and business issues as well as provided direct support to my international clients when traditional resources were less helpful.

- Nova Southeastern University – This nationally recognized university has a reputation for a strong presence in both the digital security and legal communities. Nova has provided resources on a plethora of issues that have benefited my clients domestically and abroad.





## Work Distribution

Over the last seven years, FDS has been fortunate to work in more than 200 industries and sub industries and have been involved in approximately 1,000 different engagements. FDS has collected more than 5,000 pieces of evidence and I have delivered testimony of some sort well in excess of 60 times. The following charts represent what we have done and whom we have worked for:












## Disclaimer

This document and the contents contained herein is for informational purposes only. It is deemed accurate at the time of printing. The document is seen as a living breathing organism and will be updated and/or changed when appropriate and at my discretion.

This document is not to be used for legal, legislative or any other purpose then what it is intended. Most jurisdictions provide for a specific format. This document is not intended for use in any jurisdiction. The specifically formatted document, for the jurisdiction I am engaged in will be prepared and provided as







needed. This document is not intended to be used as a comparison to any other document and it stands on its own, much like these other documents.

By taking possession of this document and reading this document you the reader agree to the afore-terms and conditions of the documents purpose and use.

